UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| ) | |
| v.                                      ) | CAUSE NO.  1:04cr30 |
| ) | |
| RANDALL ARTIS and              ) | |
| TERRANCE ARTIS                  ) | |

OPINION AND ORDER

This matter is before the court on "Defendants' Joint Motion to Dismiss Counts 1-4", which was filed on December 7, 2004.  The government responded to the motion on January 14, 2005.  The defendants have not filed a reply.

For the following reasons, the defendants' motion will be denied.

Discussion

Defendant Terrance Artis is charged, along with his brother Randall Artis[1], in a six count indictment.  Count 1 of the indictment charges Randall Artis and Terrance Artis with wire fraud, a violation of 18 U.S.C. § 1343, §1346, and § 2.  Count 3 charges Randall Artis and Terrance Artis with conspiracy to commit theft or bribery concerning programs receiving federal funds, a violation of 18 U.S.C. § 666 and § 371.  Count 4 charges Randall Artis with theft or bribery concerning programs receiving federal funds, a violation of 18 U.S.C. § 666, and § 2.  Count 5 charges Randall Artis with making false statements in a matter within the jurisdiction of the Federal Bureau of Investigation, a violation of 18 U.S.C. § 1001.  Count 6 charges Terrance Artis with influencing or injuring a grand jury, a violation of 18 U.S.C. § 1503.

---

[1] Randall Artis was the Third District City Councilman in East Chicago.

In Counts 1 and 2 of the indictment, Randall Artis and Terrance Artis and two unindicted co-conspirators, are charged with devising and intending to devise a scheme both to obtain money and property from the citizens and the City of East Chicago ("traditional fraud") and to defraud the citizens and the City of East Chicago of their intangible right to the defendants' honest services ("honest services fraud"), and with using interstate wires in furtherance of their scheme.

The defendants claim that both the traditional and honest services fraud counts should be dismissed.  As to the traditional fraud counts, the defendants charge that the indictment fails to allege that Randall Artis obtained the money or property of the citizens and City of East Chicago.  Regarding "honest services", the defendants contend that they did not personally gain by their actions, that the honest services fraud statute is unconstitutional, that the wires were not used in furtherance of the honest services portion of their fraud, and that the citizens of East Chicago do not constitute "another" under the honest services fraud statute.

The defendants also argue that Count 3 and Count 4 should be dismissed because 18 U.S.C. § 666 is unconstitutional and that an exception from the statute prohibits the government from charging the defendants.

Factual Background

The following factual allegations are taken from the Indictment. The defendants are charged in Count 1 and Count 2 with defrauding the City of East Chicago ("the City") as part of a scheme hatched in the months leading up to the contested May 4, 1999 primary election.  In 1998, the City's Board of Public Works initiated a "Street Improvement Program" to repave asphalt and replace concrete public sidewalks throughout the City, including the Third District.

The Board of Works received bids on the program, with a low bid of $454,155, but it failed to award the contract in 1998. Rather, the Board of Works approved a request to solicit new bids, which were to be opened in March 1999.

Around this time, according to the Indictment, various East Chicago officials schemed to cancel the Sidewalk Improvement Program and replace it with a program they could use to their political and personal advantage. To that end, the official project calling for the acceptance of bids was cancelled on March 23, 1999. Randall Artis authorized his brother, Terrance Artis, subcontractors working for Terrance Artis and unindicted co-conspirator Contractor A to pour concrete and cut trees throughout the Third District of East Chicago, despite the failure of the Board of Works to legally bid out the work. Randall Artis also directed these workers to perform work on private residential property, despite the lack of any authority under state law or City ordinance to authorize such work or pay for it with public funds, and guaranteed the contractors payment. Because part of the purpose of the work was to misuse public funds to ensure an electoral advantage in the May 4, 1999 primary, Randall Artis falsely represented to East Chicago citizens that the City had a program in which it could legally pay for any kind of concrete improvement made on a homeowner's or business owner's private property and offered the services of the contractors to perform work in exchange for political support. In return, Randall Artis and the City Controller permitted Terrance Artis to charge the City excessive and non-competitive rates and authorized the payment for private work.

In furtherance of the scheme, the City Controller paid Terrance Artis with public funds out of the City's bank account using manual checks to avoid the controls and review process imposed by the City's computer systems. Due to the millions of dollars in payments made to

3

Terrance Artis and other contractors, the City account incurred a multi-million dollar negative balance by May 1999 and began bouncing checks, including checks promised to Terrance Artis in exchange for work he and his sub-contractors had performed prior to the primary election. To cover these checks, the City Controller wired money directly to Terrance Artis. Ultimately, the City Controller paid Terrance Artis $1,035,186.84 for the concrete work from public funds.

In July 1999, after the work stopped, the City Controller and East Chicago Officials met with Terrance Artis and other contractors who had performed the illegal work and presented them with backdated contracts. These contracts purported to represent that all of the concrete work had been legally and properly bid out by the City in July 1998. Terrance Artis and the City Controller signed each of these contracts.

## Standard of Review

To withstand a motion to dismiss, an indictment must include the essential elements of the crimes alleged therein. United States v. Torres, 191 F.3d 799, 804 (7th Cir. 1999)(noting that an indictment is sufficient "when it sets forth the offense in the words of the statute itself, as long as those words expressly set forth all the elements necessary to constitute the offense intended to be punished.")(quotations and citations omitted); United States v. Palumbo Bros., 145 F.3d 850, 860 (7th Cir. 1998). The indictment must also inform the defendants of the nature of the charges to enable them to prepare a defense and to guard against double jeopardy. Torres, 191 F.3d at 804. In construing the indictment, the district court infers facts necessarily implied and employs "common sense." Palumbo Bros., 145 F.3d at 860. Furthermore, the indictment must be read as a whole and not in a "hypertechnical manner". Torres, 191 F.3d at 804.

There is no summary judgment procedure in criminal cases, nor do the rules provide for a

4

determination of the sufficiency of the evidence before trial. United States v. Bucey, 691 F. Supp. 1077, 1084 (N.D. Ill. 1988). As long as the indictment sets forth the elements of the crime with which a person charged with sufficient detail that it does not present double jeopardy problems, it is immune to attack by a motion to dismiss. Hamling v. United States, 418 U.S. 87, 117 (1974); United States v. Neapolitan, 791 F.2d 489, 501 (7th Cir. 1986).

Count 1 and Count 2

As noted, Count 1 and Count 2 charge the defendants with wire fraud offenses. The defendants argue that the traditional wire fraud charges must be stricken or dismissed because Randall Artis did not obtain money or property from East Chicago or its citizens. The defendants point out that the indictment fails to allege that Randall Artis obtained money or property from either the City or its citizens and argue that this omission is fatal because the Seventh Circuit has held that in mail fraud cases, only a scheme to obtain money or property from the victim by fraud supports a criminal violation and that losses that occur as byproducts of a deceitful scheme do not satisfy the statutory requirement. United States v. Walters, 997 F.2d 1219, 1224 (7th Cir. 1993).

In response, the government points out that Walters stands for the simple proposition that the federal fraud statutes only criminalize fraud schemes where the object is to obtain the victim's money or property, not those schemes where the deprivation is a mere byproduct of the scheme. Id. at 1226. Clearly, Walters precludes only the charging of traditional fraud counts where the fraudulent loss of money or property alleged is wholly tangential or at best indirectly related to the object of the scheme. However, a defendant has committed fraud where the victim's loss is the "objective of the scheme." Walters, 997 F.2d at 1226. In the present case,

the indictment alleges that the objective of the defendants' scheme was to steal or fraudulently misappropriate public dollars and illegally spend those funds on private concrete and tree-trimming projects in order to win votes and bolster the re-election chances of Randall Artis and his political allies. This court agrees with the government that because the loss alleged was not incidental, but a direct objective of the fraudulent scheme, Walters does not require that Count 1 and Count 2 be dismissed.

Moreover, as the government notes, the indictment alleges that the City Controller obtained and controlled all of the City's money. The City Controller was only permitted to pay out claims in accordance with Indiana law. The indictment alleges that, contrary to the law, the City Controller paid out funds on claims by contractors for work performed on public property for which no appropriation had been made by the City Council and no authorization secured by the Board of Works, and paid out funds on claims by contractors for work performed on private property in violation of City ordinance and Indiana law. As such, it is clear that the City Controller, in order to help achieve the fraudulent scheme's objective, obtained the City's money and property, and fraudulently and deceitfully misappropriated that money as part of the scheme.

The government further argues that, to the extent that the defendants are claiming that the indictment is insufficient because the contractors were the final recipients of the fraudulently obtained City funds as a result of the scheme, the argument fails for several reasons. First, the defendants admit that Terrance Artis was a contractor, and that the contractors as a group obtained over 1 million dollars from the victims. Second, the Seventh Circuit has repeatedly rejected the proposition that a defendant must personally obtain money or property to be found guilty of traditional mail or wire fraud. See United States v. Masquelier, 210 F.3d 756, 758-59

6

(7th Cir. 2000); <u>United States v. Ross</u>, 77 F.3d 1525, 1543 (7th Cir. 1996).  In the present case, the indictment alleges that Randall Artis, the City Controller and other East Chicago officials obtained control of the City's public money in their official capacities and schemed to use this money for unlawful electioneering purposes, causing a massive loss to the City Treasury.  This court agrees with the government that nothing more is required to meet the "scheme and intent to defraud" elements of the federal fraud statutes.

Additionally, the indictment alleges that Terrance Artis and Contractor A, who did obtain money and property, were co-conspirators or at least accomplices of Randall Artis.  Terrance Artis and other contractors knowingly submitted bills for work that they knew had not been authorized by the Board of Public Works, submitted bills to the City Controller for work performed on private and residential property, and submitted bills at excessive, non-competitive rates.  In return, Terrance Artis and Contractor A fraudulently obtained public monies to which they were not entitled for the performance of private work.  Further, Randall Artis and other East Chicago elected officials, to secure their own political elected and appointed offices, each took direct actions to aid and abet this fraudulent scheme and wrest control of those public funds away from the citizens, who were entitled to have those funds spent only on public purposes.  The fact that not only Randall Artis, but also his co-conspirator contractors, obtained the City's money and property furnishes yet another reason for refusing to dismiss the traditional wire fraud counts, as alleged in Count 1 and Count 2 of the indictment.

The government also points out that the defendants have ignored the portion of the indictment that alleges that Randall Artis asked for $4,250 from Contractor A for providing work to Contractor A.  The government states that the evidence will show that Randall Artis illegally

received $4,250 from Contractor A.  Thus, it is clear that the indictment alleges that Randall Artis obtained money or property as a result of the unlawful scheme, and the indictment is sufficient for this additional reason.

The defendants next argue that the indictment contains no allegation that the defendants misused their positions for personal gain.  The defendants assert that "political support" should not be included in the definition of "personal gain".  The defendants rely on United States v. Bloom, 149 F.3d 649 (7th Cir. 1998), to support their position.

In Bloom, a Chicago alderman, while working in his private capacity as a lawyer, advised a client to illegally employ a proxy bidder at a tax scavenger sale.  This action allowed the client to avoid paying back taxes and thus deprived Chicago of revenue.  Id. at 650-51.  The government alleged that Bloom (as an alderman) owed Chicago a fiduciary duty of loyalty and therefore could not give advice regarding a transaction that was intended to deplete Chicago's coffers.  The court dismissed the charges in Bloom primarily on the ground that the indictment did not "charge that [the defendant] used his office in any way, let alone that he misused it."  Id. at 655 (emphasis in original).  Because the charges had "nothing to do with Bloom's status as an alderman," he had not violated any duty of honest services to his employer, Chicago.  Id. at 655.

The government argues that the factual pattern in Bloom is a far cry from that alleged in the present indictment for two reasons: (1) Randall Artis did use and misuse his public office, and (2) Randall Artis did reap personal gain from that misuse while Terrance Artis aided and abetted Randall Artis.

In the present case, Randall Artis, the City Controller and other East Chicago officials are

8

all alleged to have acted in their public capacities and to have misused their offices.  Rather than demanding that contractors submit bids to the Board of Works in accordance with state law, and authorizing payment only for valid public work, the East Chicago officials, including Randall Artis, breached their duty of loyalty by handpicking the complicit contractors to perform work on private property and guaranteeing (through their official positions) that the City would pay for that work.  The City Controller breached all of his fiduciary duties as the publicly appointed fiscal officer, as he controlled and directed the illegal payout of millions of dollars.  This court finds that the present case is easily distinguishable from Bloom, and that Bloom does not require any portion of the present indictment to be dismissed.

     Moreover, to the extent that Bloom requires "personal gain", that standard is met here because the indictment alleges that Randall Artis did personally gain from the illegal acts in several respects.  First, as noted, Randall Artis is alleged to have received a $4,250 kickback.  Second, by securing the assistance of the contractors, by securing the assistance of the contractors, by directing the misuse of public funds to pay for concrete illegally poured on private property and trees cut on private property, and by personally misrepresenting to citizens that these fraudulent acts were part of a valid public works project, Randall Artis was able to gain a political advantage in securing votes in the primary election.  This political advantage was undoubtedly a gain to Randall Artis as he was able to expend public funds he helped misappropriate rather than private funds on behalf of his election campaign.  It is clear that only by fraudulently misrepresenting the source of the funds and the nature of the work, something Randall Artis, the City Controller and other East Chicago officials could do only by misusing their public offices, was it possible for Randall Artis to personally gain this political advantage

9

and support.

With respect to Terrance Artis, the government notes that the indictment also alleges that the accomplice contractors, including Terrance Artis, illegally gained public funds as a direct result of the misuse of public office. The indictment alleges that by submitting bills and taking money, cashing checks and receiving wires, Terrance Artis aided and abetted Randall Artis' honest services fraud.

While <u>Bloom</u> does not directly address whether personal gain can flow to an accomplice of the defendant in an honest services case, such a factual pattern is found in <u>United States v. Bronston</u>, 658 F.2d 920 (2nd Cir. 1981. In <u>Bronston</u>, a state senator and law firm partner contravened the interests of both his law firm and the state by attempting to influence the awarding of a contract to a specific private company. He accomplished this illegal objective by misusing both Senate stationery and confidential information he had learned through his positions. <u>Bronston</u>, 658 F.2d at 924. The only salient difference between <u>Bronston</u>, and <u>Bloom</u> was that Bronston "misused both of his positions" while Bloom did not. <u>Bloom</u>, 149 F.3d at 656. But the gain in both <u>Bronston</u> and the present case were in large measure to benefit the accomplices of the defendants: the private company in <u>Bronston</u>, and the private contractors receiving public payment for private work in the present case. Clearly, the fact that Randall Artis, the City Controller and other East Chicago officials misused their public offices for the private and personal gain of their co-conspirators, as well as for their own personal gain, provides yet another reason for upholding the indictment's allegations of honest services fraud.

The defendants next argue that the wire fraud statute's "honest services" component is unconstitutionally vague on its face and as applied. The defendants claim that the text of § 1346

10

provides no guidance as to the contours of what constitutes "honest services", and that several circuits have provided varying definitions of "honest services".  See e.g. United States v. Rybicki, 345 F.3d 124, 144 (2d Cir.  2003); United States v.  Frost, 125 F.3d 346 (6th Cir.  1997).

The government notes that it is not entirely clear what standard of review is to be applied to a facial challenge to a criminal statute.  Generally, such challenges have been permitted only when First Amendment concerns are at stake.  See e.g., Virginia v.  Hicks, 539 U.S. 113 (2003); Chapman v.  United States, 500 U.S. 453, 467 (1991).  The defendants do not assert in their motion or brief in support that the statute would in any way infringe upon their First Amendment rights.

The Supreme Court has  indicated that a court could find a federal statute facially invalid if it were "to conclude that the law is 'permeated with vagueness, and, perhaps, that it infringes on a constitutional right and has no mens rea requirement."  City of Chicago v.  Morales, 527 U.S. 41, 55 (1999).  The government argues that even under this broader standard, the defendants' facial challenge must fail because they have pointed to no constitutional right that § 1346 violates, and the statute contains a mens rea requirement, stating that a violation occurs when there is an intent to create a scheme to commit fraud.  The government correctly argues that the Seventh Circuit has repeatedly upheld at least some applications of the honest services statute.  See United States v.  Hausmann, 345 F.3d 952, 958 (7th Cir.  2003); United States v.  Martin, 195 F.3d 961, 966 (7th Cir.  1999); United States v.  Bloom, 149 F.3d 649, 656.

The defendants next contend that the honest services portion of the indictment should be dismissed because the wires allegedly did not further this portion of their scheme.  This argument relies on the contention that the honest services portion of the fraud scheme was

11

complete as soon as the votes were cast in the May 4, 1999 primary election.  The government, however, argues that the defendants' arguments should be rejected because the allegations in the indictment reflect a broader scheme by Randall Artis, the City Controller and other East Chicago officials to breach their fiduciary duties to the voting public and to benefit politically and because this scheme reached well beyond the date of the election.

In most cases, the wire element of a wire fraud scheme "is fairly easy to satisfy."  United States v.  Hickok, 77 F.3d 992, 1004 (7th Cir.  1996).  The interstate wire need only be incidental to an essential part of the scheme.  Schmuck v.  United States, 489 U.S. 705, 710-11 (1989).  In fact, the wiring need only be reasonably foreseeable to the defendants.  It is not required that the defendant himself actually initiate the wire.  United States v.  Koen, 982 F.2d 1101, 1107 (7th Cir. 1992).   A wire is not in furtherance of the scheme if it occurs after the scheme has reached fruition.  United States v.  McClellan, 868 F.2d 210, 216 (7th Cir.  1989).  However, actions that are designed to further a continuing scheme or to allow a defendant to retain ill-gotten gains that were reaped in an earlier part of a scheme will satisfy the jurisdictional requirement.  United States v.  Seward, 272 F.3d 831, 836 (7th Cir.  2001; United States v.  Wingate, 128 F.3d 1157, 1162 (7th Cir.  1997).

The Count 1 and Count 2 of the indictment in the present case allege that the wires were received on May 25, 1999 and May 27, 1999 for payment for the concrete work performed.  The government contends that the evidence at trial will show that these payments were all made for claims submitted by Terrance Artis for work performed on private property or for work performed on public property for which no bids had been made.  In each instance, the claims were made for work performed either partially or entirely before the May 4, 1999 primary

election.

The key to analyzing most challenges to the wire or mailing element of a federal fraud case is to accurately define the alleged scheme. United States v. Seward, 272 F.3d 831, 835-36 (7th Cir. 2001). The defendants attempt to limit the honest services portion of the fraud scheme to the receipt of votes on May 4, 1999. However, the indictment alleges a much broader and ongoing scheme that lasted from mid-February 1999, when the plan was hatched, until the last payments to Terrance Artis were made on November 9, 2001, and thus included the wires alleged in the indictment. This scheme encompassed a breach of the public officials' fiduciary duty of loyalty to the citizens to retain custody of public funds and expend them only for public purposes. Ordering and guaranteeing the payment of funds to Terrance Artis and to the other contractors before the primary election was one important part of the scheme, but so was following through on the bargain by actually illegally paying Terrance Artis with public funds. This court finds that the entire purpose of the scheme alleged in the indictment was to win re-election for Randall Artis and ensure that Terrance Artis was paid for his work in assisting the scheme. Thus, the interstate wires which were paid to Terrance Artis were an integral part of the alleged scheme, and are sufficient to sustain the indictment.

The defendants next argue that the City and its citizens cannot constitute "another" as that term is defined in the honest services fraud statute. See 18 U.S.C. § 1346 (prohibiting "a scheme or artifice to deprive another of the intangible right of honest services"). As the government notes, this argument can be summarily rejected because "honest services" cases routinely allege that public officials have violated duties to the people they serve. See e.g., United States v. Bryan, 58 F.3d 933, 943 (4th Cir. 1995)(defendant convicted of defrauding

13

citizens of his state of his honest services).

### Count 3 and Count 4

The defendants argue that the indictment "contains no allegation that the allegedly stolen, converted, or misapplied monies were connected, either directly or indirectly, to any federally funded program" as required for a violation of 18 U.S.C. § 666. (Def. Brief at 11).

In Sabri v. United States, 124 S.Ct. 1941 (2004), the Supreme Court was faced with the question of whether 18 U.S.C. § 666 "is a valid exercise of congressional authority under Article I of the Constitution." The Supreme Court unequivocally held "that it is." Sabri, 124 S.Ct. at 1942. The defendant in Sabri had argued that in order to be constitutional, the statute had to require proof of some connection between the bribe alleged in his case and federal money, an argument identical to that put forth by the defendants in their present motion. Id. at 1944.

However, the Supreme Court determined that it could "readily dispose of this position that, to qualify as a valid exercise of Article I power, the statute must require proof of connection with federal money as an element of the offense." Id. at 1945. "We simply do not presume the unconstitutionality of federal criminal statutes lacking explicit provision of a jurisdictional hook, and there is no occasion even to consider the need for such a requirement [as a nexus with federal funds] where there is no reason to suspect that enforcement of a criminal statute would extend beyond a legitimate interest cognizable under Article I, § 8." Id. at 1946. The Spending Clause of Section 8 authorizes Congress "to appropriate federal monies to promote the general welfare," the Court stated, and the Necessary and Proper Clause "establish[es] review for means-ends rationality" and enables Congress "to see to it that taxpayer dollars. . . are in fact spent for the general welfare, and not frittered away in graft." Id. Because "[m]oney is fungible,

14

corruption does not have to be . . . limited" to funds "skimmed from specific federal payments" to affect the federal interest.  Id.  The Court concluded that the Necessary and Proper Clause therefore provided all the authority Congress needed to ensure that federal funds were not siphoned off by corrupt public officers and that 18 U.S.C. §666(a) reasonably chose to address that problem at the source of the problem by targeting the local government agents and officials who received federal funds by "condition[ing] the offense on a threshold amount of federal dollars defining the federal interest."  Id.; see also United States v.  Fernandez, 282 F.3d 500, 511 (7th Cir.  2002); United States v.  Grossi, 143 F.3d 348 (7th Cir.  1998)(finding that because money is fungible, a defendant who receives federal funds has a greater ability to misappropriate local monies).  The indictment in the present case alleges the essential elements for 18 U.S.C. § 666, including that the City of East Chicago received more than $10,000 in federal funds during a one year period.  The government also asserts that, even though not required by the statute, it can prove that federal monies were used to pay contractors during the concrete project.

The defendants next argue that the statutory exception built into 18 U.S.C. § 666 applies to their conduct and precludes charging them in this case.  Specifically, the defendants rely on 18 U.S.C. § 666(c), which states that: "This section does not apply to bona fide salary, wages, fees, or other compensation paid, or expenses paid, or reimbursed, in the usual course of business."  The defendants argue that Counts 3 and 4 are premised on the City's payment of bona fide construction expenses to various contractors for actual work performed in the City, mostly on public property.  The defendants further assert that the payments in question were ultimately authorized by the City in the usual course of its business; that is, through the actions of its governing body.  The defendants point out that the present indictment does not allege that the

work was unnecessary or that the contractors failed to provide the work and services for which they were paid. Rather, the indictment acknowledges that concrete and tree trimming/cutting work was completed. The indictment further alleges that the City's consulting engineer was directed to measure the amount of work performed and that the City Council ultimately ratified and approved the work.

In response, the government maintains that it is quite apparent that the money paid to the contractors represents a major factual dispute between the parties and whether the work performed was bona fide and whether it was paid out "in the usual course of business." The indictment alleges that payments to the contractors authorized by the defendants were not made "in the usual course of business." Specifically, the indictment charges that the City is required to obtain competitive bids in advance on all public works projects estimated to exceed $75,000 to guard against fraud, favoritism, graft, extravagance, improvidence, and corruption like that which occurred in the City of East Chicago throughout 1999.

The government submits that monies paid out by the City for work performed on private property, as well as for work performed on public property which had never been validly bid out or authorized by the City Board of Works in violation of Indiana law and Indiana State Board of Accounts Guidelines, cannot be considered bona fide fees or compensation paid out in the usual course of business, as that term is used in 18 U.S.C. § 666(c). The government states that if the defendants wish to contest this point, they may present their argument to a jury at their upcoming trial, but they may not prevail on such claims in a motion to dismiss. See United States v. Najarian, 915 F. Supp. 1460, 1477 (D. Minn. 1996)(noting the intensive factual nature of most claims under 18 U.S.C. § 666(c)).

According to the legislative history, the purpose of 18 U.S.C. § 666(c) was to prevent the possible application of the statute "to acceptable commercial and business practices." H.R.Rep.No. 797, 99th Cong., 2d Sess. 30, reprinted in 1986 U.S.C.C.A.N. 6138, 6153 (1986). In the present case, it is alleged that public funds were spent to improve private residential property (driveways and walkways) and cut trees on private property. The spending of public funds on a private purpose violates Indiana law and cannot be considered an acceptable governmental practice. Additionally, public money was spent at excessive rates on public sidewalks because the project was not bid out properly under the Indiana laws designed to protect against extravagance and graft. 18 U.S.C. § 666(c) does not exempt from its coverage the intentional misapplication of funds that are used even for otherwise legitimate purposes, when the funds are intentionally misapplied. United States v. Urlacher, 979 F.2d 935, 938 (2nd Cir. 1992). In the present case, it is clear that the payments allegedly made by the City Controller at the behest of his co-defendants were at least arguably not made "in the usual course of business," and the exception noted in 18 U.S.C. § 666(c) therefore does not require that this portion of the indictment be dismissed.

## Conclusion

On the basis of the foregoing, the defendants' motion to dismiss is hereby DENIED.

Entered: April 12, 2005.

s/ William C. Lee<br>
William C. Lee, Judge<br>
United States District Court